UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BILLY D. FOWLER,

        Petitioner,

    v.

MAGGIE MILLER-STOUT,

        Respondent.

Case No. C07-5356 RJB/KLS

REPORT AND
RECOMMENDATION

**NOTED FOR:**
**June 20, 2008**

       Petitioner Billy D. Fowler filed a 28 U.S.C. § 2254 habeas corpus petition related to his November 2004 convictions for the delivery of a controlled possession - methamphetamine, the possession of a controlled substance with intent to deliver -methamphetamine, and money laundering.  (Dkt. # 1).  Respondent answered (Dkt. # 20) and submitted the relevant record of state court proceedings.  (Dkts. # 20 and 35).

       Having carefully considered the parties' filings and the record relevant to the grounds raised in the petition, it is recommended that Mr. Fowler's habeas petition be denied and this action be dismissed.

REPORT AND RECOMMENDATION- 1

# I.  FACTUAL BACKGROUND

**A.     State Court Procedural History**

Mr. Fowler appealed to the Washington Court of Appeals. (Dkt. # 20, Exhs. 3-6).  The Washington Court of Appeals affirmed Mr. Fowler's convictions, but reversed the school bus stop sentencing enhancements. *Id*., Exh. 2.

Mr. Fowler sought review by the Washington Supreme Court. *Id*., Exhs. 7-9.  The Washington Supreme Court denied review on October 31, 2006, and the mandate issued on December 1, 2006.  *Id*., Exhs. 10-11.

**B.     State Court Factual Background**

The Washington State Court of Appeals provided the following summary of the facts surrounding Mr. Fowler's crimes:

> Billy Duane Fowler and his wife, Pamela Fowler, purchased a home in Vancouver, Washington, in April 2001. The Fowlers made a $40,000 down payment consisting of $10,000 cash and four or five checks of varying amounts. Pamela [footnote 3 omitted] testified that they borrowed the money for the down payment from a variety of legitimate sources. The home was within 1,000 feet of two school bus stops in December 2002.
>
> During 2002, and the first half of 2003, the Fowlers owned three businesses. Bright Touch Enterprises began operation in October 2002. The Fowlers' bookkeeper, Kim Amos, worked for Bright Touch Enterprises from October 2002 to April 2003, and testified that the company was not profitable and that she recalled the company losing some money. The Fowlers' second business, B & P Drywall, [footnote 4 omitted] did not enjoy a high volume of business in 2002, but it showed profits on its contract jobs. Finally, Amos testified that the third business, Creative Concrete, had "quite a few jobs" but was not sure whether it was profitable during late spring and summer 2002. 6-B Report of Proceedings (RP) at 643.
>
> Pamela testified that Billy generated the majority of the couple's income during 2001, 2002, and 2003 from gambling. Billy reported income from casinos on Indian reservations on his federal tax returns, but he did not report gambling income from other locations. Pamela testified that Billy likely did not report $20,000 to $30,000 on their 2002 federal tax return.

REPORT AND RECOMMENDATION- 2

Deborah Nichols testified that Billy employed Richard Jordan on and off in the concrete business and that Jordan obtained drugs from Billy and sold a portion of those drugs to her. She met Billy between April and October 2002, when Jordan told Billy that Nichols would pick up two ounces of methamphetamine. Thereafter, Billy "fronted" her the methamphetamine with the expectation that she would sell the drugs for him. 5-A RP at 308. For the following six months, Billy regularly fronted methamphetamine to Nichols for sale, for personal use, and also to play video poker. [court's footnote 5. While she did not know how many people were involved, Nichols testified that she was not the only person selling methamphetamine for Billy in 2002. Further, Nichols explained that he had a friend who, as a favor, would "enforce" drug debts owed to Billy. Nichols was not sure whether Billy employed anyone to act as an "enforcer" or "tax man." 5-A RP at 316.] Nichols and Billy also began a sexual relationship during the first six months of their acquaintance. After the six-month period ended, Nichols purchased methamphetamine from Billy for her personal use only.

Around May 2002, Billy asked Nichols if she knew someone who would exchange checks for cash. Billy told Nichols that he had cash income from both gambling and business that he did not want to deposit in the bank because the bank would be suspicious and he would be taxed. Nichols responded that her father, Chester Jennings, would be willing and did, in fact, write checks in exchange for cash on six different occasions in amounts ranging from $3,000 to $8,000. Nichols explained that she believed some of the cash Billy exchanged was from drug sales because on one occasion Nichols and Billy stopped at a house, Billy dropped off drugs and picked up money, and the two proceeded to Nichols' father's house. Both Nichols and Jennings testified that Billy did not provide services to Jennings in exchange for Jennings' checks.

Pamela testified that Billy used Jennings' checks to persuade his business partner that he was in financial trouble, forcing him to borrow money from Jennings when, in fact, Billy concealed earnings from his business partner because Billy disapproved of his business partner's financial dealings.

In November 2002, Nichols contacted officers with the Clark-Skamania Drug Task Force (DTF). Nichols agreed to participate in controlled methamphetamine buys from Billy in exchange for her release from jail. She performed controlled buys from Billy on December 18 and 19, 2002. On December 18, 2002, DTF officers met with Nichols, strip searched her and searched her vehicle to ensure she did not have any contraband in her possession prior to the buy, provided her with money to purchase methamphetamine, and followed her to Billy's home. DTF officers then closely observed Billy's home during Nichols' stay.

Nichols entered Billy's home, gave him the money, and used methamphetamine with Jordan, who was also present at the house. Billy returned with methamphetamine to the room where Nichols and Jordan were, the three sat for a while, then Nichols left in her car. DTF officers followed Nichols to a location

REPORT AND RECOMMENDATION- 3

where they again searched her person and vehicle. Nichols gave the officers an amount of suspected methamphetamine consistent with the amount of money provided to her prior to the buy. [court's footnote 6. The powder was later tested and found to contain methamphetamine.]

The following day, Nichols conducted a second controlled buy at Billy's home. Nichols called Billy who told her to come over if she wished to purchase methamphetamine. Nichols met with DTF officers, who again searched both her person and vehicle before she drove to Billy's home. DTF officers again followed Nichols to Billy's home, observed her enter the home, observed her exit the home a short time later, and followed her to a pre-arranged location. Again, Nichols was under DTF surveillance during the entire process. Nichols gave the DTF officers the methamphetamine she had purchased. While Nichols testified that she arranged the purchase with Billy over the telephone, Jordan actually handed her the drugs in Billy's garage.

Coincidentally, on December 23, 2002, Vancouver police officer Paul Fisk stopped Billy because the splash guards/mud flaps on Billy's truck were inadequate to prevent spraying debris from the truck's oversized knobby tires. Officer Fisk obtained Billy's driver's license and asked him to exit the vehicle so that Officer Fisk could explain the nature of the infraction. Officer Fisk noticed that Billy's passenger, Jordan, was not wearing his seatbelt. Jordan verbally identified himself after Officer Fisk asked for identification. When Officer Fisk entered Jordan's information in his computer, he learned that Jordan was in violation of his probation, called for a cover officer, and arrested Jordan. Officer Fisk then explained that he was going to search Billy's vehicle incident to Jordan's arrest. Officer Fisk searched the vehicle and discovered a large zip-lock bag containing $2,270 and three smaller baggies, each containing crystalline powder. [court's footnote 7. One baggie contained 21 grams of methamphetamine; one baggie contained 7/10 of a gram of methamphetamine; and one baggie contained crystalline powder that tested negative for methamphetamine.] Officer Fisk also found two glass pipes containing methamphetamine residue, $671 cash on Billy's person, and white powder strewn across the passenger compartment of the truck. [court's footnote 8. Vancouver police did not attempt to gather or test the powder strewn in the passenger compartment of the truck. In addition, Department of Corrections officer Jeff Frice conducted a search of Billy's truck that produced results largely duplicative of those reached by Officer Fisk's search.]

Earlier in the day on December 23, 2002, Terry Horton, an acquaintance of Billy, was at Nichols' house to help a friend work on his truck. Nichols was selling a car and Billy came over to test drive it. While he test drove the car, Horton testified that Nichols went into Billy's pickup and began "digging around" behind the seat on the passenger side. 7 RP at 732. She got out of the truck with one of Billy's credit cards and told Horton that "[t]he bastard owes me money." 7 RP at 733.

DTF officers executed a search warrant at Billy's home on July 9, 2003.

REPORT AND RECOMMENDATION- 4

Officers discovered a "scrape bag" [court's footnote 9. The term "scrape bag" is used to describe a bag containing a small amount of methamphetamine. 5-B RP at 437] of methamphetamine in the pocket of a jacket hanging in Billy's bedroom closet. 5-B RP at 437. DTF officer Charles Christensen testified that he did not speak with Billy during the search and that he did not know if the jacket was Billy's. Pamela later testified, however, that the jacket was not Billy's and that it probably belonged to her brother or to one of Billy's friends.

The State filed a fourth amended information on October 7, 2004, charging Billy with (1) one count of possession of a controlled substance with intent to deliver-methamphetamine (former RCW 69.50.401(a)(1)(ii) (1998)); RCW 9A.08.020(3))(December 23, 2002); (2) two counts of unlawful delivery of a controlled substance (former RCW 69.50.401(a))) (December 18 and 19, 2002), with school zone enhancements for delivering methamphetamine within 1,000 feet of the perimeter of school grounds; (3) six counts of money laundering (RCW 9A.83.020) (check exchanges with Jennings); and (4) one count of unlawful possession of a controlled substance (former RCW 69.50.401(d) (1998)) (July 9, 2003).

The trial court denied Billy's motion to sever the money laundering counts from the remainder of the State's charges. [court's footnote 10. Before trial, the trial court also denied (1) Billy's motion to suppress evidence gathered on December 23, 2002; (2) Billy's Knapstad motion, *State v. Knapstad,* 107 Wn.2d 346, 729 P.2d 48 (1986), regarding the State's second delivery charge (the December 19, 2002 controlled buy); and (3) Billy's motion to find Washington's Special Inquiry Judge Act void for vagueness. Billy does not, however, assign error to the trial court's rulings on these motions.] The jury found Billy guilty of possession of a controlled substance with intent to deliver-methamphetamine, guilty on both counts of unlawful delivery of a controlled substance, and guilty on one count of money laundering. The jury could not reach a verdict on the remaining five money laundering counts. [court's footnote 11. The trial court dismissed the remaining five counts of money laundering at sentencing.] By special verdict, the jury also found that both deliveries took place within 1,000 feet of a school bus stop. Finally, the jury found Billy not guilty of unlawful possession of a controlled substance.

The trial court sentenced Billy to 111 months confinement, which included two school bus stop enhancements of 24 months running consecutively to each other and to the underlying sentence. . . .

(Dkt. # 20, Exh. 2, pp. 2-7).

## II.  CLAIMS FOR RELIEF

Mr. Fowler raises the following grounds for relief in his federal habeas petition:

1)      The petitioner's Fourth, Sixth, and Fourteenth Amendments to the United States Constitution were violated by the Police Officer's [sic] in the illegal search of the

REPORT AND RECOMMENDATION- 5

petitioner's vehicle, and the Trail [sic] Court abused it's Discretion by denying the petitioner's Motion to Dismiss evidence which was obtained by an illegal search, and Discovery violations by the State.

2)   The petitioner's right to a fair trial was denied under the United States Constitution, Fourteenth Amendment when the Trail [sic] Court (1) failed to grant a Motion for Severance of Counts, (2) when it allowed the State to present evidence of similar bad acts.

3)   The petitioner's right to Due Process guaranteed by the Fourteenth Amendment to the United States Constitution was violated when the State failed to provide Discovery of Special Inquiry Subpoena's [sic], and an improper use of Special Inquiry Process.

4)   The petitioner's right to a fair trial under the Fourteenth Amendment to the United States Constitution was violated by the cumulative error's [sic] in this case.

(Dkt. # 2, p. 1).

Respondent concedes that all Petitioner's claims have been exhausted.  (Dkt. 19, p. 7).

### III.  EVIDENTIARY HEARING

The decision to hold a hearing is committed to the court's discretion.  *Williams v. Woodford*, 306 F.3d 665, 688 (9th Cir. 2002).  The petitioner bears the burden of showing the need for a hearing. *Pulley v. Harris*, 692 F.2d 1189, 1197 (9th Cir. 1982), rev'd on other grounds, 465 U.S. 37 (1984); *Baja v. Ducharme*, 187 F.3d 1075 (9th.Cir. 1999).   A hearing is not required if the claim presents a purely legal question, or if the claim may be resolved by reference to the state court record. *Campbell v. Wood*, 18 F.2d 662, 679 (9th Cir.) (en banc), cert. denied, 114 S. Ct. 2125 (1994).

The undersigned concludes that there are no relevant factual disputes to resolve in order to render its decision in this case and accordingly, an evidentiary hearing need not be conducted.

### IV.  STANDARD OF REVIEW

This Court's review of the merits of Mr. Fowler's claims is governed by 28 U.S.C.§ 2254(d)(1).   Under that standard, the Court cannot grant a writ of habeas corpus unless a petitioner

REPORT AND RECOMMENDATION- 6

demonstrates that he is in custody in violation of federal law and that the highest state court

decision rejecting his ground was either "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(c) and (d)(1).  The Supreme Court holdings at the time of the state court decision

will provide the "definitive source of clearly established federal law."  *Van Tran v. Lindsey*, 212

F.3d 1143, 1154 (9th Cir. 2000), *overruled in part on other grounds by Lockyer v. Andrade*, 538

U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).    A determination of a factual issue by a state

court shall be presumed correct, and the applicant has the burden of rebutting the presumption of

correctness by clear and convincing evidence.  28 U.S.C. §2254(e)(1).

A state-court decision is contrary to clearly established precedent if it "applies a rule that

contradicts the governing law set forth in" a Supreme Court decision, or "confronts a set of facts

that are materially indistinguishable" from such a decision and nevertheless arrives at a different

result.  *Early v. Packer*, 537 U.S. 3 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06)

(2000)).   "A state court's interpretation of state law, including one announced on direct appeal of

the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546

U.S. 74, 76 (2005).  Therefore, a federal court may not overturn a conviction simply because the

state court misinterprets state law.  *See id*. at 605; *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The court "is limited to deciding whether a conviction violated the Constitution, laws, or

treaties of the United States." *Id*. at 68; *see also Smith v. Phillips*, 455 U.S. 209, 221 (1982)

("Federal courts hold no supervisory authority over state judicial proceedings and may intervene

only to correct wrongs of constitutional dimension.").  In addition, for federal habeas corpus relief

to be granted, the constitutional error must have had a "substantial and injurious effect or influence

in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993) (citation

REPORT AND RECOMMENDATION- 7

omitted).

## V. DISCUSSION

### A.    First Claim - Suppression of Evidence

Mr. Fowler claims that the state court erred when it denied his motion to dismiss evidence seized during the search of his vehicle.  (Dkt. # 1, p. 1; Dkt. # 2, pp. 11-18).   Mr. Fowler claims, *inter alia*, that the search exceeded the scope of the stop, that he was never read his *Miranda*[1] warnings, and he was detained for over 45 minutes for a stop that was later found to be unlawful. *Id*.

In *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." There is no dispute that Mr. Fowler was given, and took advantage of, every opportunity to present evidence, to cross examine witnesses, and argue the law at his trial and again on appeal.   Mr. Fowler complains that the trial court did not enter findings of fact and conclusions of law to support its decision denying his motion to suppress (Dkt. # 2, p. 18) and that the trial judge abused his discretion in relying on a decision in another court.  *Id*., p. 19.

However the United States Supreme Court requires only the initial opportunity for a fair hearing.  *Id*. at 494.  Such an opportunity for a fair hearing forecloses this court's inquiry, upon a habeas corpus petition, into the trial court's subsequent course of action, *Mack v. Cupp*, 564 F.2d 898, 902 (9th Cir.1977); *Cody v. Solem*, 755 F.2d 1323 (8th Cir.1985); *Griffin v. Rose*, 546 F.Supp. 932, 935 (E.D.Tenn.1981), *aff'd,* 703 F.2d 561 (6th Cir.1982), including whether or not the trial

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

court has made express findings of fact. *See Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 855, 83 L.Ed.2d 841 (1985).

The trial transcript provides a complete record of the findings and rulings made by the trial court.  (Dkt. # 35, pp. 3-56).  The trial court's decision is found at pages 53-56.  It would be reversible error to fail to accord a presumption of correctness to the trial court's fact finding underlying its determination of probable cause. *Sumner v. Mata,* 449 U.S. 539, 550-51, 101 S.Ct. 764, 770-71, 66 L.Ed.2d 722 (1981).

Mr. Fowler also presented this claim before the Washington Court of Appeals for review. That court concluded that the search was valid:

> Billy argues that his detention by Vancouver Police exceeded the scope of the December 23, 2002 traffic stop and, therefore, the subsequent search of his vehicle was invalid.  Billy is incorrect.

> Incident to a valid arrest, law enforcement may conduct a warrantless search of the arrestee's person and the passenger compartment of the vehicle that he occupied at the time of the arrest.  *State v. Johnson*, 128 Wn.2d 431, 446-47, 909 P.2d 293 (1996); *State v. Stroud*, 106 Wn.2d 144, 152, 720 P.2d 436 (1986).

> Officer Fisk stopped Billy on December 23, 2002, because the mud flaps/splash guards on his truck's oversized tires were inadequate to prevent the truck's tires from spraying debris onto other vehicles behind the truck.  Officer Fisk asked Billy for his driver's license and to step out of the vehicle so that he could explain the problem with the truck's tires.  Office Fisk also noticed that Billy's passenger was not wearing a seat belt.  He asked for identification and Jordan verbally identified himself.  Officer Fisk returned ot his patrol car and ran a check on both Billy and Jordan.  Officer Fisk determined that Jordan was in violation of his probation.  Officer Fisk placed Jordan under arrest and searched the passenger compartment of Billy's vehicle incident to that arrest.

> Officer Fisk's valid arrest of Jordan entitled the officer to search the passenger compartment of Billy's vehicle.  The search was valid. [court's footnote 20.  Billy also argues that the search was invalid because he was not read his *Miranda* warnings until after the search.  The protections afforded in *Miranda* deal with admissions and evidence obtained from arrestees by law enforcement through custodial interrogation, not searches incident to arrest.  *See generally Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)].

REPORT AND RECOMMENDATION- 9

(Dkt. # 20, Exh. 2, pp. 18-19).

As Mr. Fowler had the opportunity and in fact, did litigate his Fourth Amendment claims in the trial court and the state appellate court, this claim is not cognizable in this habeas corpus proceeding and it is recommended that his first habeas claim be denied.

**B.     Second Claim for Relief - Severance**

In his second habeas claim for relief, Mr. Fowler argues that the trial court erred when it failed to sever the drug delivery charges from the money laundering charges and when it allowed evidence of similar bad acts.  (Dkt. # 2, pp. 25-31).

Respondent argues that no United States Supreme Court decision has ever expressly held that improper joinder of charges alone violates the Constitution.  However, the Ninth Circuit recognizes that federal habeas is available for improper consolidation if the simultaneous trial "actually rendered [the petitioner's] state trial fundamentally unfair and hence, violative of due process."  *Park v. California*, 202 F.3d 1146, 1149 (2000) (*citing Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991).  Each count is considered separately to determine whether the trial on a particular count was fundamentally unfair in light of that count's joinder with one or more other charges.  *Featherstone*, 948 at 1503.  The petitioner has the burden to prove unfairness rising to the level of a due process concern.  *See McKenzie v. McCormick*, 27 F.3d 1415, 1418 (9th Cir. 1994).

Mr. Fowler argues that evidence as to the six money laundering charges, which spanned a period of three years, was weak, based on unreliable testimony, and should not have been admitted as to the drug counts.  (Dkt. # 2, pp. 25-26).  He also argues that there was an enhanced possibility of prejudice from allowing the jury to hear the money laundering evidence as part of the drug case even though the jury acquitted Mr. Fowler on one of the possession charges (Count 10) and was able to decide only one of the six money laundering counts.  (Dkt. # 2, p. 26).

REPORT AND RECOMMENDATION- 10

A violation of state law standing alone is not cognizable in federal court on habeas.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780) (1990); *Featherstone*, 948 F.2d at 1503.   Mr. Fowler has the burden of showing, in federal constitutional terms, that his state trial was fundamentally unfair.  *Park*, 202 F.3d at 1149.  The failure of the jury to convict on all counts is "the best evidence of the jury's ability to compartmentalize the evidence."  *United States v. Baker*, 10 F.3d 1374, 1387 (9th Cir. 1993) (quoting *United States v. Unruh*, 855 F.2d 1993) (9th Cir. 1987).

In this case, the jury could not reach a verdict on five counts and found Mr. Fowler not guilty of the unlawful possession of a controlled substance charge. (Dkt. # 36, pp. 889-892).  This verdict suggests that the jury did not cumulate evidence or base its decisions on admission of Mr. Fowler's drug-related activity. Rather, the verdict suggests that the jury considered each count separately and properly compartmentalized the evidence on each count.  Mr. Fowler has failed to demonstrate that his state trial was fundamentally unfair.

In affirming Mr. Fowler's conviction, the Washington Court of Appeals discussed Mr. Fowler's argument that the trial court abused its discretion in denying his motion to sever:

> Billy argues that the trial court should have granted his motion to sever the money laundering charges. He argues that evidence of drug-related activity with Nichols and Jordan before the December controlled buys and the December 23, 2002 traffic stop, admitted to support the money laundering charges, improperly influenced the jury.
>
> CrR 4.3(a) permits joinder of two or more offenses that (1) are of similar character even if the offenses are not part of a single scheme or plan; or (2) are based on a series of acts connected together or constituting parts of a single scheme or plan. CrR 4.3(a)(1), (2); *State v. Bythrow,* 114 Wn.2d 713, 717, 790 P.2d 154 (1990). Offenses properly joined under CrR 4.3(a) may be severed, however, if the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense. CrR 4.4(b); *Bythrow,* 114 Wn.2d at 717; *State v. Cotten,* 75 Wn. App. 669, 686, 879 P.2d 971 (1994). A defendant seeking severance has the burden of demonstrating that the joinder of offenses would be so manifestly prejudicial as to outweigh the concern for judicial economy. *Bythrow,* 114 Wn.2d at

REPORT AND RECOMMENDATION- 11

718; *Cotten,* 75 Wn. App. at 686.

The trial court's refusal to sever counts is reversible only upon a showing that the court's decision constituted a manifest abuse of discretion. *Bythrow,* 114 Wn.2d at 717. Further, if joinder was improper but offenses were nonetheless consolidated in one trial, we affirm convictions if the error was harmless. *State v. Bryant,* 89 Wn. App. 857, 864, 950 P.2d 1004 (1998).

Joinder of offenses may prejudice a defendant in that (1) he may become confounded in presenting separate defenses; (2) the jury may use the evidence of one crime charged to infer guilt on another crime charged; or (3) the jury may cumulate evidence of the various charged crimes and find guilt when, if considered separately, it would not so find. *Bythrow,* 114 Wn.2d at 718. But factors that tend to mitigate prejudice from joinder include: (1) the strength of the State's evidence on each of the counts; (2) the clarity of the defenses on each of the counts; (3) the propriety of the trial court's instruction to the jury regarding the consideration of each count separately; and (4) the admissibility of evidence of the other crime. *Cotten,* 75 Wn. App. at 687.

Here, the State's theory was that Billy was a methamphetamine dealer who disguised his earnings from drug sales as loans from Jennings, and that these acts constituted part of a single scheme based on a series of acts constituting separate parts of a single scheme or plan. CrR 4.3(a) permits joinder of two or more offenses that are based on a series of acts connected together or constituting parts of a single scheme or plan. CrR 4.3(a)(2); *Bythrow,* 114 Wn.2d at 717-18. We construe this rule expansively to conserve judicial and prosecution resources. *Bryant,* 89 Wn. App. at 864.

Turning to the question of whether Billy was prejudiced by joinder of the money laundering and drug charges, the facts of this case are analogous to those in *Cotten* where the court discredited the defendant's assertion that the presentation of one defense undercut a second defense by explaining that the defendant's defenses to both charges at issue were the same and, thus, could not affect his ability to make his defenses clear to the jury. 75 Wn. App. at 687. Billy's defense to the money laundering and drug charges is effectively the same. His drug charges defense asserts that he had no involvement with drugs he did not possess, sell, or intend to sell methamphetamine. Similarly, Billy's defense to the money laundering charges contend that his cash-for-check exchanges with Jennings had no relationship to earnings from drug sales.

The joinder of offenses did not prevent a clear defense on both charges because the advancement of one defense does not undercut the other defense. Both defenses rest on denial of involvement with drugs.

Furthermore, the trial court instructed the jury to decide each count separately and that the jury's verdict on one count should not control its verdict on

REPORT AND RECOMMENDATION- 12

any other count. These jury instructions have been held sufficient to protect against prejudice that may result from joinder of offenses. *Cotten,* 75 Wn. App. at 688. And we presume that a jury follows the trial court's instructions. *State v. Foster,* 135 Wn.2d 441, 472, 957 P.2d 712 (1998). Moreover, Billy neither objected to the proposed jury instructions nor requested any limiting instruction to further avoid unfair prejudice that may have been caused by cumulative consideration of evidence by the jury. Failure to request a limiting instruction waives any error or unfair prejudice that may have been cured by a limiting instruction. *State v. Ramirez,* 62 Wn. App. 301, 305-06, 814 P.2d 227 (1991); *State v. Barber,* 38 Wn. App. 758, 771, 689 P.2d 1099 (1984).

While it may be questionable whether testimony about Billy's drug-related activity with Nichols and Jordan would have been admissible in a separate trial on only the drug charges, [court's footnote 12. Billy concedes that the evidence was probably admissible in the money laundering case to establish that the cash he exchanged for checks came from illegal activities] severance is not automatically required when the evidence on one charge is not admissible in a separate trial on other charges. *Bythrow,* 114 Wn.2d at 720. When the State's evidence is strong on each count despite the lack of cross-admissibility, there is no necessity for the jury to base its finding of guilt on any one count on the strength of the evidence of another count. [footnote 13 omitted] *Bythrow,* 114 Wn.2d at 721-22.

Here, the evidence was strong on the December 18 and 19 controlled buys by Nichols and the December 23 traffic stop where drugs and money were recovered from Billy's truck. And the jury found Billy not guilty of the unlawful possession of a controlled substance charge. This verdict suggests that the jury did not cumulate evidence or base its decisions on admission of his drug-related activity with Nichols and Jordan before December 18. Rather, the verdict suggests that the jury considered each count separately and properly compartmentalized the evidence on each count.

The trial court did not abuse its discretion in denying Billy's motion to sever the money laundering charges from the drug charges.

(Dkt. # 20, Exh. 2, pp. 8-11).

The conclusion reached by the Washington Court of Appeals was not unreasonable.  To the contrary, the state appellate court considered the strength of the state's evidence on each count, the clarity of defenses as to each court, the court's instructions to the jury and admissibility of evidence of other charges if not joined for trial.

Finally, as to Mr. Fowler's argument that the failure to sever resulted in the improper admission of evidence of similar bad acts, the undersigned agrees that this allegation does not

REPORT AND RECOMMENDATION- 13

demonstrate a constitutional violation. A federal habeas court cannot review questions of state evidence law. *See Henry v. Kernan*, 177 F.3d 1152, 1159 (9th Cir. 1999). It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *See id.* (citing *Hill v. United States*, 368 U.S. 424, 428 (1962); and *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993)).

As noted above, the state court reasonably denied this claim because Mr. Fowler did not show admission of the bad acts evidence rendered the trial unfair and caused actual prejudice. (Dkt. # 20, Exh. 2, p. 18). This Court is not aware of any United States Supreme Court case that would, under the same factual scenario, render a result opposite to that reached by the Washington Court of Appeals.

For these reasons, the undersigned recommends that Mr. Fowler's second claim for habeas relief be denied.[2]

**C.      Third Claim for Relief - Violations of Discovery and Special Inquiry Subpoenas**

Mr. Fowler's third claim for relief is based on his claim that his due process rights were

---

[2]Mr. Fowler also states as a general proposition that "severance of joined offenses may be necessary to avoid prejudice when a defendant wishes to testify regarding some counts and invoke the Fifth Amendment (sic) regarding others," however he does not contend that the joinder of counts in this case unduly affected his choice to testify. (Dkt. # 2, p. 27). Mr. Fowler is correct that he has a due process right to testify in his own defense, but that right does not guarantee that he may testify only to information favorable to his defense. *Rock v. Arkansas*, 483 U.S. 44, 52 (1987). Joinder of counts may unduly affect a defendant's choice whether to testify. *See, e.g., United States v. Balzano*, 916 F.2d 1273, 1283 (7th Cir. 1990). To obtain severance because of this prejudicial effect, a defendant "must show that he has important testimony to give on some counts and a strong need to refrain from testifying on those he wants severed." *See United States v. Nolan*, 700 F.2d 479, 483 (9th Cir. 1983). Thus, in support of a motion for severance, a defendant must specifically identify the testimony he would offer in his defense so that the trial court can determine if that testimony is important enough to justify severance. *Comer v. Schiro*, 463 F.3d 934, 959 (9th Cir. 2006). There is nothing in the record to indicate that Mr. Fowler moved for severance on his right to testify in his own defense.

REPORT AND RECOMMENDATION- 14

violated by the State's refusal to provide Motion Data Terminal transmission records related to his traffic stop and copies of the Special Inquiry Subpoenas used in its pre-trial investigation for the production of records relating to his bank accounts.  (Dkt. # 2, pp. 32-42).  Mr. Fowler claims that the evidence is exculpatory.  *Id*., p. 36.

The Washington Court of Appeals held that Mr. Fowler was not entitled to relief on the alleged discovery violations because he had waived the claim:

> Billy contends that he made several unanswered requests for (1) the Mobile Data Terminal (MDT) transmissions of Officer Fisk's traffic stop; and (2) copies of the special inquiry subpoenas the State used to investigate Billy.
>
> 1. Mobile Data Transmissions
>
> Billy cites Clerk's Papers at 139 and Report of Proceedings at 108-125 in support of his argument that he made numerous requests for the MDT transmissions. Clerk's Papers at 139, however, does not mention MDT transmissions. But two of Billy's attorneys filed omnibus applications requesting production of the MDT transmissions. [court's footnote 21. Billy, in a pro se omnibus application to the trial court, also requested the MDT transmissions. It does not appear that the State or the trial court signed this application.] In response, the State agreed to provide them. But no subsequent mention was made of the MDT transmissions. Nor were they discussed during Billy's (1) suppression hearing; (2) fourth attorney's omnibus application; (3) motion to sever; (4) Knapstad motion; (5) motion asking the trial court to rule that Washington's Special Inquiry Judge Act, chapter 10.29 RCW, is void for vagueness; or (6) motion requesting copies of the special inquiry subpoenas.
>
> Billy asserts that "the records were essential to the defense in order to prove that the traffic stop was pretextual and contingent upon the earlier contact with a police informant whom [sic] planted the evidence in the defendant's vehicle. [court's footnote 22. Billy is presumably referring to the December 23, 2002 traffic stop leading to the State's possession with intent to deliver charge and Horton's testimony that Nichols was "digging around" (7 RP at 732) the back of Billy's truck hours before the traffic stop.] SAG at 7.
>
> Discovery violations should be raised at trial so the trial court can compel discovery if necessary. *State v. Boot*, 40 Wn. App. 215, 220, 697 P.2d 1034 (1985). As the language of CrR 4.7(h)(7)(i) indicates, a party should raise noncompliance with the discovery rules "during the course of the proceedings." The failure to raise the issue below waives the right to assign error to an alleged discovery violation on appeal. See also *State v. Wilson*, 56 Wn. App. 63, 66, 782 P.2d 224 (1989); *Boot*, 40 Wn. App. at 220 (claim of error based on a discovery violation waived by failing to

REPORT AND RECOMMENDATION- 15

make a timely objection).

Further, while the State must disclose all material evidence favorable to the defendant, the evidence must be material before a defendant may claim prejudice from the State's failure to disclose it. CrR 4.7(e)(1); see *Banks v. Dretke,* 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L.Ed.2d 1166 (2004); see also *Brady v. Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). The materiality standard requires that there is a reasonable probability of a different result had the evidence been discovered. *Banks,* 540 U.S. at 698-99. Here, the materiality of the MDT transmissions to Billy's defense is purely speculative.

Finally, the MDT transmissions are not in the record. Thus, Billy's assertions regarding their necessity to prove pretext require evidence outside the record. "If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition, which may be filed concurrently with the direct appeal." *McFarland,* 127 Wn.2d at 335. We do not consider matters outside the record. *McFarland,* 127 Wn.2d at 335.

2. Special Inquiry Subpoenas

Billy also asserts that the State has never produced copies of the special inquiry subpoenas the trial court ordered produced on October 27, 2004.

On September 28, 2004, Billy moved for production of copies (and noted that he had at some time before requested copies) of the special inquiry subpoenas issued during the State's investigation. [court's footnote 23. Billy, in a pro se omnibus application to the trial court, also requested the special inquiry subpoenas. It does not appear that the State or the trial court signed this application. Further, Billy's attorney indicated on the record that at least one of Billy's previous attorneys had requested the subpoenas.] The State responded that it did not have authority to release copies of the subpoenas absent a court order. [court's footnote 24. The State further suggests in its brief that it did not have the subpoenas in its possession.] The State provided "copies of everything that [it had] gotten from [the Special Inquiry Judge]" and gave Billy copies of the two affidavits filed with the court in support of the issuing of the special inquiry subpoenas. 3 RP at 117. Billy does not disagree that the State had provided these records. The trial court agreed to issue an order compelling release of the copies of the subpoenas and informed Billy that they were on file at the Clark County Clerk's Office.

On October 27, 2004, nearly three weeks after the trial concluded, the trial court issued the order releasing copies of the subpoenas. Billy received two letters from the Clark County Clerk's Office, dated November 18, 2004, and March 17, 2005, indicating that the office had yet to locate the subpoenas for numerous reasons, including lack of cooperation by the State. [court's footnote 25. These letters are not designated Clerk's Papers. They appear to have been only in Billy's possession. In

REPORT AND RECOMMENDATION- 16

its brief, the State indicated that it decided to obtain and file certified copies of the subpoenas with the trial court and designate them as additional Clerk's Papers. Copies of the subpoenas were, in fact, filed on September 14, 2005.]

Billy asserts violation of the Fourteenth Amendment to the United States Constitution. A defendant may raise a constitutional violation for the first time on appeal, but the burden is on the defendant to show that it represents a "manifest error" and that it had practical and identifiable consequences on the trial. *State v.. WWJ Corp.,* 138 Wn.2d 595, 602-03, 980 P.2d 1257 (1999). For purposes of reviewing an alleged constitutional error not raised at trial, if the record is insufficient to determine the merits of the constitutional claim, then the claimed error is not manifest and review not warranted. *WWJ Corp.,* 138 Wn.2d at 602.

Here, it is difficult to discern what prejudice may have resulted from the State's failure to produce copies of the subpoenas before trial. Billy has not asserted that the State limited his access to the evidence obtained during the special inquiry process. Furthermore, Billy did not raise the issue before the trial court, nor did he ask for a trial continuance so he could obtain them. The State also notes that Billy failed to raise the issue at his sentencing hearing and that he withdrew his motion for a new trial. We find that Billy failed to show a manifest error resulting in a complete miscarriage of justice.

C. Use of the Special Inquiry Process

Billy contends that the State used the special inquiry process to gather evidence to support charges already filed. In *State v. Manning,* 86 Wn.2d 272, 275, 543 P.2d 632 (1975), our Supreme Court held that a special inquiry proceeding may not be used to discover or gather evidence against a defendant for crimes already charged.

Billy was charged with one count of possession with intent to deliver on December 26, 2002, a charge arising solely out of the traffic stop on December 23, 2002. Billy contends that the State used the special inquiry process to gather evidence to support that charge. The State responds that the drug task force had been conducting a separate investigation of Billy's methamphetamine sales and that it used the special inquiry process to investigate the money laundering charges.

Billy's claim fails. There is no evidence that the State used the special inquiry process to gather evidence to support the possession with intent to deliver charge. On the other hand, the evidence does demonstrate that the State filed eight charges unrelated to the December 26, 2002 charge in August 2003, and that there was substantial evidence at trial on the other charges.

(Dkt. # 20, Exh. 2, pp. 19-23).

REPORT AND RECOMMENDATION- 17

Habeas corpus relief does not lie for alleged violations of state discovery rules. *See, e.g.,*

*Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987) (claim alleging violation of Hawaii's rules of

criminal procedure for failure to provide police detective's handwritten notes to cross-examine

witness deprived him of the opportunity to effective cross-examine the witness are not appropriate

in habeas proceeding).  In this case, there is no explanation of the materiality of the MDT

transmissions to Mr. Fowler's defense.  As noted by the Washington Court of Appeals, Mr. Fowler

failed to raise the issue of their production at the trial court during his suppression hearing and other

pre-trial discovery motions and thereby waived the right to assign error to any alleged discovery

violation on appeal.  *Id.*, pp. 19-20.  *See, e.g., Reed v. Ross*, 468 U.S. 1, 11 (1984) ("A prisoner who

under state law has waived the right to appeal a constitutional claim may not obtain federal habeas

corpus relief on that issue without demonstrating cause for, and actual prejudice from, the default.)

Federal relief is unavailable to a habeas petitioner if he is procedurally barred from raising the

federal issue in a state habeas proceeding. *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497,

2507, 53 L.Ed.2d 594 (1977). The claim will be barred from reconsideration in federal court if the

state court judgment on collateral review is clearly and expressly grounded on a state procedural

rule. *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 1043, 1044 n. 10 (1989).  We are bound by the

state court's interpretation of its own rules. *McSherry,* 880 F.2d at 1052 n. 2; *Allen v. Morris,* 845

F.2d 610, 614 (6th Cir.1988), *cert. denied,* 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989).

With regard to Mr. Fowler's claim as to copies of the Special Inquiry Subpoenas, the court

must analyze the claim keeping in mind that due process requires that criminal prosecutions

"comport with prevailing notions of fundamental fairness."  *California v. Trombetta*, 467 U.S. 479,

485 (1984).  The state must afford criminal defendants a "meaningful opportunity to present a

meaningful defense," *id.*, which in turn requires that the State must provide the accused with

exculpatory evidence.  *Featherstone*, 948 F.2d at1504.   In this case, however, it is uncontested that Mr. Fowler and his counsel had access to all of the evidence the State obtained from the subpoenas. (Dkt. # 35, pp. 117-118).  In his state court appeal and his petition before this Court, Mr. Fowler fails to show any prejudice from not receiving copies of the subpoenas in question or that they are material or relevant.

Under AEDPA, this court may grant relief on this claim only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court." 28 U.S.C. 254(d)(1). The state court decision denying Mr. Fowler's claim that he was denied due process by the failure to provide him with the MDT transmissions and the Special Inquiry Process subpoenas was not contrary to clearly established federal law as determined by the United States Supreme Court. *See, Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000).  Accordingly, the undersigned recommends that Plaintiff's third claim for habeas relief be denied.

**D.     Fourth Claim - Cumulative Error**

In his fourth claim for relief, Mr. Fowler alleges that the combination of errors, when considered cumulatively, violate due process.  (Dkt. # 2, p. 42).  Mr. Fowler argues that a cumulative error analysis is necessary because his right to a fair trial under the Fourteenth Amendment was violated by the cumulative effect of the trial court errors in this case namely, those errors mentioned in the three habeas claims discussed above.  *Id*.

Respondent argues that the Supreme Court has never recognized cumulative error as a basis for habeas corpus relief, that Mr. Fowler has not shown the existence of a constitutional error in any of his claims and therefore, is not entitled to relief under a cumulative error analysis, and the state court decision denying his claim was not contrary to an unreasonable application of clearly

REPORT AND RECOMMENDATION- 19

1   established federal law.

2       The Supreme Court has established that the combined effect of multiple trial court errors

3   violates due process where it renders the resulting criminal trial fundamentally unfair.  *Chambers v.*

4   *Mississippi*, 410 U.S. 284, 298, 302-03 (1973) (combined effect of individual errors "denied

5   [Chambers] a trial in accord with traditional and fundamental standards of due process" and

6   "deprived Chambers of a fair trial."); *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).  However,

7   Mr. Fowler has not demonstrated the existence of a constitutional error in any of his previous

8   claims sufficient to undermine confidence in the verdict, thereby negating the necessity for a

9   cumulative error analysis.  *See, e.g., Thompson v. Calderon*, 109 F.3d 1358, 1369 (9th Cir. 1996)

10  (finding no prejudice from the errors taken separately, we also find no cumulative prejudice. *See*

11  *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir.1978) (en banc) ("prejudice may result from the

12  cumulative impact of multiple deficiencies"), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d

13  793 (1979)).

14      The Washington Court of Appeals denied Mr. Fowler's cumulative error claim as follows:

15          Billy argues that there were numerous errors amounting to cumulative error
16          entitling him to a new trial.

17              The cumulative error doctrine applies when several errors occurred at the
18          trial court level, none alone warranting reversal, but the combined errors effectively
19          denied the defendant a fair trial.  *State v. Hodges*, 1189 Wn. App. 668, 673-74, 77
20          P.3d 375 (2003), *review denied*, 151 Wn.2d 1031 (2004).  The defendant bears the
21          burden of proving cumulative error of sufficient magnitude that a retrial is necessary.
22          *See In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964
23          (1994).  Here, the trial court did not abuse its discretion by denying Billy's motion to
24          sever.  Second, while testimony regarding Billy's prior bad acts may have lacked
25          admissibility in a trial limited solely to the drug charges, the strength of the State's
26          evidence supporting the drug charges negated any prejudice that might have
27          otherwise resulted.  Finally, Billy's counsel repeatedly objected to the trial court's
            admission of Billy's drug-related activities with Nichols and Jordan before
            December 18, 2002, and unsuccessfully moved to sever the money laundering
            charges from the drug charges.

28  REPORT AND RECOMMENDATION- 20

(Dkt. # 20, Exh. 2, pp. 17-18).

The state court decision denying Mr. Fowler's claim was not contrary to clearly established federal law as determined by the United States Supreme Court.  *See, Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000).  Accordingly, the undersigned recommends that Plaintiff's fourth claim for habeas relief be denied.

## VI.  CONCLUSION

Based on the foregoing discussion, Mr. Fowler's  habeas petition should be denied, and this action dismissed.  A proposed Order of Dismissal accompanies this Report and Recommendation.  No evidentiary hearing is required as the record conclusively shows that Mr. Fowler is not entitled to relief.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **June 20, 2008** as noted in the caption.

DATED this 29th  day of May, 2008.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION- 21